# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

X----------------------------------------------------------

TAMERA ADAMS,

Plaintiff,

v.                                                                    05 Civ. _____

THAT'S NICE LLC, NIGEL WALKER,                           JURY TRIAL
NATSUMI WALKER, and PATRICK STUARD,                 DEMANDED

Defendants.

X----------------------------------------------------------

## COMPLAINT

RECEIVED
SEP 27 2005
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, TAMERA ADAMS, by and through her undersigned counsel, as and for her Complaint in this action against Defendants That's Nice LLC, Nigel Walker, Natsumi Walker and Patrick Stuard (collectively, "Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

1.     This is an action for declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices and retaliation against Plaintiff, including their discriminatory treatment, racial harassment, and unlawful retaliatory termination of Plaintiff due to her Race and/or Color (African-American/Black), in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and due to her Gender, Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law, New York Executive Law §§ 290 et seq. and the New York City Human Rights Law, New York Administrative Code §§ 8-101 et seq.





2.      This action also seeks monetary damages to redress Defendant That's Nice's unlawful breach of Plaintiff's employment contract, including the Company's breach of its duty of good faith and fair dealing in violation of New York State law.

3.      This action further seeks monetary damages to redress Defendant That's Nice's unlawful failure to notify Plaintiff in writing of the termination of her employment, including notice of the date of cancellation of her medical insurance coverage and of her right to elect to the continuation of such medical coverage, in violation of the Employee Retirement Income Security Act, as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161 et seq. ("COBRA"), and New York Labor Law § 195.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under Section 1981. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

6.      Plaintiff Tamera Adams ("Ms. Adams" or "Plaintiff") is an African-American female who resides in Brooklyn, New York. At all relevant times, she met the definition of an "employee" under all applicable statutes.

7.      Defendant That's Nice LLC ("That's Nice" or the "Company") is a Delaware corporation with a principal place of business located at 18 West 27th Street, New York, New York 10001. Defendant That's Nice is a marketing communications firm. At all relevant times, the Company met the definition of an "employer" under all applicable statutes.

8.      Defendant Nigel Walker is a Caucasian male who resides in Westchester County, New York. At all relevant times, he was the managing director and co-founder of That's Nice, in which capacity he participated directly in the unlawful employment decisions, actions and retaliation taken against Ms. Adams.

9.      Defendant Natsumi Walker is an Asian female who resides in Westchester County, New York. At all relevant times she was an owner of That's Nice, in which capacity she participated in the unlawful retaliation against Ms. Adams.

10.     Defendant Patrick Stuard is a Caucasian male who resides in New York County, New York. At all relevant times, he was the Senior Print Designer for That's Nice, in which capacity he participated directly in the unlawful employment actions taken against Ms. Adams.

## ADMINISTRATIVE PROCEDURES

11.     Prior to the commencement of this action, a copy of this Complaint was served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

12.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment With That's Nice

13.     In or about April 2004, Ms. Adams began working for That's Nice as a freelance copywriter, and her job duties included drafting, editing and proofreading the content inserted into print advertisements, brochures, direct mailings and other marketing/advertising materials.  Due to her excellent work, Ms. Adams was offered a six-month employment contract as a full-time copywriter by That's Nice in or about July 2004, which was in effect from July 2004 through December 2004.

14.     Ms. Adams was the only African-American female employee at That's Nice.

15.     Throughout her employment at the Company, Ms. Adams' work performance was outstanding and she received praise for the quality of her work both from management and clients.

16.     In December 2004, Ms. Adams was offered and she accepted a second employment contract to continue working as a copywriter for That's Nice (the "2005 Contract").

17.     The 2005 Contract provided for a one-year term of employment from January 1, 2005 through December 31, 2005.  Pursuant to paragraph 13a of the 2005 Contract, Plaintiff was entitled to one week's notice in writing of termination of her employment.  Paragraph 14 of the 2005 Contract also sets forth a complaint procedure. In this provision, That's Nice agreed that a meeting would be conducted within one week of receipt of any complaint from Ms. Adams and that "every attempt [would] be made to resolve the matter as soon as possible."  Although the 2005 Contract provides that acts of discrimination or harassment are grounds for dismissal, there is no statement in the 2005 Contract of any commitment by the Company to maintain a workplace free of discrimination and harassment.

**Defendant Stuard's Poor Treatment Of Plaintiff**
**And Other Women At That's Nice**

18.     In or about October 2004, That's Nice hired Defendant Stuard as a Senior Print Designer responsible for designing advertisements, brochures, direct mailings or other marketing/advertising materials.

19.     From the time he began his employment with That's Nice, Defendant Stuard often acted in a disrespectful, hostile and condescending manner towards Ms. Adams and other female employees at the Company.  Specifically, Defendant Stuard would alter the text Ms. Adams created for the Company's advertisements, brochures or

other products, either changing the content and/or layout of her work. Defendant Stuard engaged in such conduct despite the fact that he, as a designer, had no authority over the text of the product, known as "copy," which was, in fact, Ms. Adams' specific area of responsibility. Indeed, Defendant Stuard and Ms. Adams were peers. Defendant Stuard was not Ms. Adams' superior and he had neither the responsibility nor the authority to change or supervise her work.

20.    On most occasions, Defendant Stuard made changes to Ms. Adams' copy without consulting or informing her. Defendant Stuard's acts in this regard threatened Plaintiff's job performance because Plaintiff was responsible for the copy in the Company's products and was, therefore, accountable for those word choices Defendant Stuard made without her consent or consultation.

21.    Defendant Stuard did not subject similarly situated male employees of That's Nice to this type of treatment.

22.    Defendant Stuard engaged in this behavior on an ongoing basis, changing Plaintiff's copy repeatedly throughout October and November 2004. By way of example only, in early November 2004, Defendant Stuard improperly added a significant amount of language to a print ad that Ms. Adams had drafted without consulting Ms. Adams or even the client. Embarrassingly, Ms. Adams was not made aware of the change to her copy until she was on a conference call with the client who had to point out the change to her, which, moreover, the client had not requested or authorized.

23.     After this conference call, Ms. Adams addressed the issue with Defendant Stuard who refused to acknowledge that he had interfered with her client relationship and spoke to Ms. Adams in an inappropriate and condescending manner.

24.     Following each incident of Defendant Stuard changing her copy, Ms. Adams sought to resolve the issue with Defendant Stuard, explaining to him on a number of occasions that her text was her area of responsibility. Defendant Stuard, however, did not respond appropriately. Rather, he consistently refused to acknowledge her role as copywriter, refused to acknowledge he was doing anything wrong or acting without authority, and dismissed her concerns with an inappropriate and insulting tone.

25.     Ms. Adams was not the only woman who was subjected to poor treatment by Defendant Stuard. Grace Huang, an Account Executive for That's Nice, as well as two female designers who worked for Defendant Stuard, Nicola Lauden and Young Tae, all experienced similar problems working with Defendant Stuard.

26.     Defendant Stuard subjected Ms. Adams to this harmful and hostile conduct due to her Gender and with the intent to discriminate against her. Similarly situated male colleagues were not subjected to this type of conduct. Thus, Ms. Adams received disparate treatment in the terms and conditions of her employment due to her Gender.

**Management Was Well Aware Of Stuard's Conduct,
Yet Failed To Rectify The Disparate Treatment**

27.     From the very beginning, and each time she experienced a problem thereafter, Plaintiff sought management's assistance with Defendant Stuard. For

example, the first time Defendant Stuard changed Ms. Adams' copy in late October 2004, she approached her manager, Mark Allen, the Creative Director, partner and co-founder of That's Nice, for guidance. Mr. Allen confirmed that the Defendant Stuard's department was separate from Plaintiff's department and that Defendant Stuard did not have authority to and should not rearrange or edit Plaintiff's copy. Ms. Adams informed Defendant Stuard of her conversation with Mr. Allen, but to no avail, as he continued to alter her work.

28. Subsequently, Ms. Adams informed Mr. Allen each time Defendant Stuard changed her copy. For example, following the embarrassing conference call in November 2004, Plaintiff again sought the assistance of Mr. Allen by sending him an e-mail describing the problem. Mr. Allen, however, took no disciplinary action against Defendant Stuard.

29. Ms. Huang also informed management of the problems she experienced with Defendant Stuard. Specifically, Ms. Huang reported Defendant Stuard's unwarranted encroachment upon female employee's responsibilities and poor treatment of women to her manager, Guy Tiene, the Business Manager for That's Nice. Mr. Tiene told Ms. Huang he would "intervene on her behalf because he did not want to lose anyone on the team as a result of this."

30. Mr. Tiene, spoke with Ms. Adams shortly after Ms. Huang had approached him. Mr. Tiene acknowledged to Plaintiff that all of the women at That's Nice were having problems with Stuard and mentioned that he would raise the issue with Defendant Nigel Walker ("Defendant Walker").

31.     Upon information and belief, Tiene and Defendant Walker spoke about
the female staff's complaints regarding Defendant Stuard the following day.

32.     On or about January 17, 2005, and after speaking with Mr. Tiene,
Defendant Walker asked Ms. Adams to gather the three other women in the office to join
him for lunch at a local diner outside the office to discuss the problems regarding
Defendant Stuard.  Thereafter, Ms. Adams and Ms. Huang, as well as Nicola Laudan and
Young Tae, who were both female print designers at the Company, joined Defendant
Walker for lunch.

33.     At that lunch, each woman complained about how Defendant Stuard
treated them with disrespect and inappropriate condescension and how only the female
employees were subjected to this treatment.  However, instead of offering to discipline
Defendant Stuard, Defendant Walker justified or explained away each of Defendant
Stuard's actions.

34.     For example, Defendant Walker attempted to excuse Defendant Stuard's
behavior by stating,"'Well you know he's married to a crazy Israeli woman.  Every
Israeli I know is crazy.  So he probably has no control at home and when he comes to
work he's a little more aggressive."

35.     After this lunch, Defendant Walker failed to take any disciplinary action
against Defendant Stuard based on the complaints he heard from Ms. Adams and the
other female employees, which constituted a violation of paragraph 14 of the 2005
Contract regarding the Company's agreement to attempt to resolve such complaints.

**Defendant Stuard's Poor Treatment Of Ms. Adams Continues**

36.     On or about January 25, 2005, Defendant Stuard approached Ms. Adams with two samples of a mailer in which he had completely changed her copy. In response, Ms. Adams asked Defendant Stuard what was problematic about her copy, noting that neither sample contained her original copy, and asked whether he needed more or less copy for the space in his design.

37.     Defendant Stuard did not answer Ms. Adams' questions. Rather, he responded in a hostile and condescending tone stating, "I don't need superfluous copy!"

38.     Thus, as this final example demonstrates, Defendant Stuard subjected Ms. Adams to hostility and condescension, and further placed her job at risk by altering copy for which she was responsible. While other female employees experienced similar problems with Stuard, similarly situated male employees were not subjected to this type of conduct. Management was specifically informed of Defendant Stuard's discriminatory conduct and did not rectify the problem. Thus, Defendants unlawfully subjected Ms. Adams to disparate treatment on the basis of her Gender.

**Defendant Walker Chastises And Berates Plaintiff**
**For Her Continued Complaints About Defendant Stuard**

39.     On February 1, 2005, Ms. Adams met with Defendant Walker and Messrs. Tiene and Allen. Instead of finally addressing Defendant Stuard's discriminatory conduct toward the women in the office, Defendant Walker chastised Ms. Adams, telling her that in objecting to Defendant Stuard's unauthorized and inappropriate changes to her

copy on January 25, 2005, she had committed "a personal attack on Patrick." Defendant Walker also stated, in substance, " I told you in the diner to leave things alone."

40.     In response to this attempt to blame her for Defendant Stuard's unlawful behavior, Ms. Adams told Defendant Walker that she felt that Defendant Walker had a bias in favor of Defendant Stuard and that at the diner in mid-January he had trivialized the complaints made by the women in the office against Defendant Stuard.

41.     Defendant Walker then exploded at Plaintiff yelling loudly, "This is what I am talking about, I see why Patrick can't talk to you!" Defendant Walker proceeded to storm out of the room, having told Ms. Adams and Messrs. Tiene and Allen, "we'll continue in the morning."

42.     The next morning, February 2, 2005, Defendant Walker met with Ms. Adams alone to discuss her complaints about Defendant Stuard.  Ms. Adams explained to Defendant Walker that she had gone through the proper channels yet the situation remained unresolved.

43.     In reply, Defendant Walker explicitly threatened Ms. Adams' employment, stating, "I don't know if you'll have a job at the end of the day."

44.     Defendant Walker subjected Ms. Adams to such yelling and abusive comments and threatened to take away her employment based on her Gender, Race and/or Color (African-American/Black) and in retaliation for her complaints about Defendant Stuard's discriminatory conduct.

**Ms. Adams Is Fired In Retaliation For Raising Claims of Bias**

45.     Within two weeks of the February 2 meeting at which Defendant Walker
threatened Ms. Adams' employment, Defendant Walker issued to Ms. Adams a written
warning without cause on February 14, 2005, placing Ms. Adams on a twelve-week
period of probationary review due to her alleged personal attack on Defendant Stuard.
The warning provided that during this probationary period, Ms. Adams was to be
reviewed every four weeks and she would not be allocated any paid holidays.  The
warning also threatened immediate termination if any other similar incident occurred
through December 31, 2006.

46.     Upon information and belief, no similar discipline was ever imposed upon
Defendant Stuard or indeed any other Caucasian male employee of the Company.

47.     Defendant Walker informed Ms. Adams that if she had questions
regarding the terms of the document, he would only address them after working hours.

48.     That same day, after a scheduled staff meeting that ran until 6:30 p.m.,
Ms. Adams sent an e-mail to Defendant Walker asking to discuss the terms of the written
warning and further stating, "I feel like you are treating me differently because I'm a
black woman."  She then proceeded directly to Defendant Walker's office to speak with
him.

49.     When Ms. Adams arrived in Defendant Walker's office, he said,
specifically referring to her e-mail, "I'd knew . . . you'd try this," and demanded that she
sign the written warning.

50.     When Ms. Adams refused, stating that she could not sign the warning because she disagreed with its contents, Walker announced, "Then you are fired now."

51.     Further, when Ms. Adams headed back to her desk to collect her things and Defendant Walker yelled, "You can't touch your computer!"

52.     Defendant Walker unlawfully terminated Ms. Adams on the basis of her Gender, Race and/or Color (African-American/Black) and in retaliation for her complaints about discrimination in the workplace to which she had been subjected.

**Defendants' Post-Termination Misconduct**

53.     Upon information and belief, on February 15, 2005, the day after Ms. Adams' unlawful termination, Defendant Walker told the staff that Ms. Adams was no longer working at That's Nice because of her potential lawsuit against the Company that could cause That's Nice to go out of business.

54.     Upon information and belief, also on February 15, 2005, Defendant Walker interviewed each That's Nice employee to see what they knew about the alleged personal attack by Ms. Adams on Defendant Stuard on January 25, 2005.

55.     Moreover, contrary to its legal obligations and treatment of Caucasian former employees, Defendant That's Nice's February 14, 2005 termination of Plaintiff was never formalized in writing. Nor did she receive any written communication of the exact date on which her medical insurance coverage would be cancelled as a result of her termination.

56.     Following her termination and continuing to date, Defendant That's Nice has also failed to provide Plaintiff with the federally - mandated COBRA notification that would have enabled her to elect to continue her medical coverage. Upon information and belief, this likewise conflicts with the Defendant That's Nice's treatment of Caucasian employees.

57.     As a result, Plaintiff was forced to suffer through post-termination medical problems that went untreated because she was denied the legal right to continue her medical coverage following That's Nice's termination of her employment.

**Defendants Further Retaliated Against Ms. Adams By**
**Wrongfully Challenging Her Right To Unemployment Benefits**

58.     In addition, on or about February 16, 2005, Ms. Adams applied for unemployment benefits through the New York State Department of Labor (the "NYSDOL"). Ms. Adams' application was initially granted, but she did not receive unemployment checks immediately because, as the NYSDOL explained, they were missing some wage period information from Ms. Adams' file. Ms. Adams supplied the missing information to NYSDOL, and on or about March 9, 2005, Ms. Adams received an unemployment check from NYSDOL covering the weeks of February 27 through March 6, 2005.

59.     On March 28, 2005, Ms. Adams received via Federal Express a termination letter from Defendant Walker dated March 21, 2005. The March 21, 2005 letter from Defendant Walker falsely stated that her employment was being terminated "for failing to report for more than one month." Subsequently, Ms. Adams received

notice from the NYSDOL that the Company was opposing her receipt of unemployment benefits.

60.     The Company, by letter dated March 29, 2005, which was signed by Defendant Natsumi Walker, and in testimony given in two subsequent NYSDOL hearings, opposed Ms. Adams' application for unemployment benefits with the false claim that she was not terminated on February 14, 2005, but rather abandoned her position and was fired for absenteeism four weeks later.

61.     Specifically, the March 29, 2005 letter by Defendant Natsumi Walker falsely stated "[o]n March 21, 2005, Ms. Adams' contract was terminated for failure to report to this office for the duration exceeding four weeks. To note, Ms. Adams was not formally dismissed on 14th February. She walked out after refusing to acknowledge our disciplinary measures and probation period as an effort to sustain her employment. We therefore feel that Ms. Adams effectively resigned her position at That's Nice LLC and her contract was later terminated due to absenteeism. Her pay and benefits were retrospectively continued up to 14th February 2005."

62.     On April 19, 2005, the NYSDOL held its first hearing on Ms. Adams' claim for unemployment benefits. Ms. Adams did not testify at the hearing because she had obtained new counsel and requested a continuance. Defendant Walker, however, did testify.

63.     Defendant Walker falsely testified that on January 27, 2005, shortly after Ms. Adams' alleged altercation with Defendant Stuard, she was provided a written

warning and that she had until February 14, 2005 to acknowledge receipt and acceptance of that warning in order to continue her employment at That's Nice.

64.     Furthermore, Defendant Walker falsely told the Administrative Law Judge assigned to the case that on February 14, 2005, the day Ms. Adams was allegedly due to acknowledge and accept the written warning, she left the office and never returned. Defendant Walker also falsely told the Judge that he had decided to fire Ms. Adams on March 21, 2005, because she had been "absent" from work for over a month. Defendant Walker added that Ms. Adams' health insurance benefits had been terminated on February 14, 2005, because that was the last day that he had seen her in the office.

65.     Clearly, Defendant Walker's misrepresentations and false testimony at Ms. Adams' NYSDOL hearing were intended to further retaliate against Plaintiff for her asserting claims of discrimination.

66.     On or about May 17, 2005, Ms. Adams was denied reinstatement of unemployment benefits because the NYSDOL concluded, based on Defendant Walker's false testimony, that she had voluntarily left her job without good cause.

67.     Subsequently, Ms. Adams successfully re-opened the case and a second hearing with the NYSDOL was held. During this second hearing, Defendant Walker repeated the above-described falsehoods concerning the time and circumstances surrounding the termination of Plaintiff's employment. Following this second hearing, the Administrative Law Judge assigned to the matter concluded that Ms. Adams' employment had been terminated as of February 14, 2005 and thus reversed the initial decision denying her unemployment benefits.

68.     Defendants That's Nice, Natsumi Walker and Nigel Walker deliberately gave false testimony and information to the NYSDOL in order to deny Plaintiff unemployment benefits in retaliation for her complaints of discrimination and bias.

69.     The retaliatory conduct by Defendants That's Nice, Natsumi Walker and Nigel Walker resulted in, among other things, a delay in the payment of Plaintiff's unemployment compensation benefits as well as Plaintiff needlessly incurring the costs and inconvenience of having to go through with the unemployment compensation appeals process.

70.     As a result of Defendants' discriminatory treatment, harassment, retaliation and other unlawful conduct, Ms. Adams has suffered, and continues to suffer, substantial monetary and/or economic damages, including but not limited to, the loss of past and future income, compensation, job security and other benefits.

71.     As a result of Defendants' discriminatory treatment, harassment, retaliation and other unlawful conduct, Ms. Adams has suffered, and continues to suffer, loss of career fulfillment and harm to her career as well as her professional and personal reputation.

72.     As a result of Defendants' discriminatory treatment, harassment, retaliation and other unlawful conduct, Ms. Adams has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering.

73.     Defendants' discriminatory treatment, harassment, retaliation and other unlawful conduct toward Ms. Adams were intentional, done with malice and/or showed a deliberate, willful and wanton or reckless disregard for Ms. Adams and her civil rights under Section 1981 and the New York State and New York City Human Rights Laws.

## AS AND FOR A FIRST CAUSE OF ACTION
**(Discrimination and Harassment in Violation of Section 1981)**

74.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 73, inclusive, as if fully set forth herein.

75.     Defendants have discriminated against Plaintiff on the basis of her Race and/or Color (African-American/Black) in violation of Section 1981 by denying her the same terms and conditions of employment available to employees who are not African-American/Black, including but not limited to, subjecting her to disparate working conditions and disciplinary standards, denying her the opportunity to work in an employment setting free of unlawful harassment, and terminating her employment.

76.     Defendants have discriminated against Plaintiff on the basis of her Race and/or Color (African-American/Black) in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive racial harassment of Plaintiff by her supervisor and co-worker.

77.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues

to suffer, harm for which she is entitled to an award of monetary damages and other relief.

78.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Retaliation in Violation of Section 1981)**

79.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 78, inclusive, as if fully set forth herein.

80.     Defendants have retaliated against Plaintiff by, inter alia, terminating her employment and wrongfully opposing her application for unemployment benefits, in violation of Section 1981 for her opposition to and/or her participation in lodging complaints against Defendants' discriminatory practices.

81.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

82.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
**(Discrimination and Harassment in Violation of
New York State Human Rights Law)**

83.   Plaintiff hereby repeats and realleges each and every allegation in
paragraphs 1 through 82, inclusive, as if fully set forth herein.

84.   Defendants have discriminated against Plaintiff on the basis of her
Gender, Race and/or Color (African-American/Black) in violation of the New York State
Human Rights Law by denying to her equal terms and conditions of employment,
including but not limited to, subjecting her to disparate working conditions and
disciplinary standards, denying her the opportunity to work in an employment setting free
of unlawful harassment, and terminating her employment.

85.   Defendants have discriminated against Plaintiff on the basis of her
Gender, Race and/or Color (African-American/Black) in violation of the New York State
Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing
to prevent or to remedy a hostile work environment that included, among other things,
severe and pervasive harassment of Plaintiff by her supervisor and co-worker.

86.   As a direct and proximate result of Defendants' unlawful and
discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff
has suffered, and continues to suffer, harm for which she is entitled to an award of
monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION
**(Retaliation in Violation of New York State Human Rights Law)**

87.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 86, inclusive, as if fully set forth herein.

88.     Defendants have retaliated against Plaintiff by, inter alia, terminating her employment and wrongfully opposing her unemployment benefits, in violation of the New York State Human Rights Law for her opposition to and/or her participation in lodging complaints against Defendants' discriminatory practices.

89.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A FIFTH CAUSE OF ACTION
**(Aiding and Abetting Violations of New York State Human Rights Law)**

90.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 89, inclusive, as if fully set forth herein.

91.     Defendants Walker, Natsumi Walker and Stuard knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York State Human Rights Law.

92.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A SIXTH CAUSE OF ACTION

**(Discrimination and Harassment in Violation of**
**New York City Human Rights Law)**

93.     Plaintiff hereby repeats and realleges each and every allegation in

paragraphs 1 through 92, inclusive, as if fully set forth herein.

94.     Defendants have discriminated against Plaintiff on the basis of her

Gender, Race and/or Color (African-American/Black) in violation of the New York City

Human Rights Law by denying to her equal terms and conditions of employment,

including but not limited to, subjecting her to disparate working conditions and

disciplinary standards, denying her the opportunity to work in an employment setting free

of unlawful harassment, and terminating her employment.

95.     Defendants have discriminated against Plaintiff on the basis of her Race

and/or Color (African-American/Black) in violation of the New York City Human Rights

Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or

to remedy a hostile work environment that included, among other things, severe and

pervasive harassment of Plaintiff by her supervisor and co-worker.

96.     As a direct and proximate result of Defendants' unlawful and

discriminatory conduct in violation of the New York City Human Rights Law, Plaintiff

has suffered, and continues to suffer, harm for which she is entitled to an award of

monetary damages and other relief.

97.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
**(Retaliation in Violation of New York City Human Rights Law)**

98.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 97, inclusive, as if fully set forth herein.

99.     Defendants have retaliated against Plaintiff by, inter alia, terminating her employment and wrongfully opposing her application for unemployment benefits, in violation of the New York City Human Rights Law for her opposition to and/or her participation in lodging complaints against Defendants' discriminatory practices.

100.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

101.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**(Aiding and Abetting Violations of New York City Human Rights Law)**

102.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 101, inclusive, as if fully set forth herein.

103.    Defendants Walker, Natsumi Walker and Stuard knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York City Human Rights Law.

104.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

105.    Defendants' unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A NINTH CAUSE OF ACTION**
**(Violation of COBRA)**

106.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 105, inclusive, as if fully set forth herein.

107.    At all relevant times, Defendant That's Nice maintained a group health insurance plan in which Plaintiff participated as a qualified beneficiary.

108.    Plaintiff's termination on or about February 14, 2005, was a qualifying event that obligated Defendant That's Nice to provide Plaintiff with notice of her right to continue her medical insurance coverage under COBRA.

109.    In violation of COBRA, Defendant That's Nice failed to provide Plaintiff with the required notice of her right to continue her medical insurance coverage, and Plaintiff lost her medical insurance when Defendant That's Nice terminated her employment.

110.    As a direct and proximate result, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief, including but not limited to payment of the monetary fine prescribed in 29 U.S.C. § 1132(c).

**AS AND FOR A TENTH CAUSE OF ACTION**

**(Violation of New York Labor Law)**

111.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 110, inclusive, as if fully set forth herein.

112.    At all relevant times, Defendant That's Nice maintained a group health insurance plan in which Plaintiff participated as a qualified beneficiary.

113.    Defendant That's Nice terminated Plaintiff's employment on or about February 14, 2005, and was obligated to notify Plaintiff in writing of the exact date of such termination as well as the exact date of cancellation of Plaintiff's medical insurance coverage.

114.    In violation of the New York Labor Law, Defendant That's Nice failed to provide Plaintiff with the required written notice. Plaintiff lost her medical insurance when Defendant That's Nice terminated her employment.

115.    As a direct and proximate result, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief, including but not limited to payment of the monetary penalty prescribed in New York Labor Law § 517.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Breach of Contract)

116.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 115, inclusive, as if fully set forth herein.

117.    Defendant That's Nice and Plaintiff agreed to an enforceable one-year employment contract that stipulated particular terms and conditions of employment that were to remain in effect from January 1, 2005 through December 31, 2005 (Exhibit A).

118.    On or about February 14, 2005, Defendant That's Nice willfully, and without cause or notice, breached Plaintiff's Contract by failing to give her one week's notice as mandated by her Contract - Section 13b.

119.    Defendant That's Nice further breached Section 14 of Plaintiff's Contract by failing to arrange a meeting concerning her complaints about Defendant Stuard within a week of her making these complaints, both verbally and in writing, to senior management.

120.    As a direct and proximate result of Defendant Walker's breach of contract, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages.

**AS AND FOR A TWELVETH CAUSE OF ACTION**

**(Breach of Covenant of Good Faith and Fair Dealing)**

121.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 120, inclusive, as if fully set forth herein.

122.    Defendant That's Nice and Plaintiff agreed to an enforceable one-year employment contract that contained an implied covenant of good faith and fair dealing.

123.    By virtue of Defendant That's Nice's unjustified and discriminatory termination of Plaintiff's employment and other wrongful conduct, including but not limited to, intentionally depriving Plaintiff of one week's notice before terminating her, failing to promptly investigate and address her complaints, and subjecting Plaintiff to disparate treatment, harassment and ultimately termination due to her Gender, Race, and/or Color (African-American/Black), Defendant That's Nice willfully breached its implied in law obligation to treat Plaintiff fairly and in good faith.

124.    As a direct and proximate result of Defendant That's Nice's breach of the covenant of good faith and fair dealing, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

      A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State and City of New York and/or are otherwise unlawful and tortious;

      B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

      C.    An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of her, as well as to take such affirmative action, including but not limited to reinstatement, as is necessary to ensure that the effects of these unlawful employment practices and tortious conduct are eliminated and do not continue to affect Plaintiff;

      D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

      E.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of

self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

F.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

G.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H.    An award of punitive damages;

I.    An award of the monetary fine provided for in 29 U.S.C. §1132 (c);

J.    An award of the monetary penalty provided for in New York Labor Law §217;

K.    An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

L.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully submitted,

THOMPSON WIGDOR & GILLY LLP

By:

Kenneth P. Thompson (KT-6026)
Scott Browning Gilly (SG-6861)
Douglas H. Wigdor (DW-9737)
350 Fifth Avenue, Suite 5720
New York, NY 10118
Telephone: (212) 239-9292
Facsimile: (212) 239-9001

COUNSEL FOR PLAINTIFF